# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

| | | |
|---|---|---|
| B.B. by and through his mother, and | ) | |
| next friend, Randi Hodges, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. CV:12-J-0210-J |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter is before the court on the record. This court has jurisdiction pursuant to 42 U.S.C. § 405. The plaintiff is seeking reversal or remand of a final decision of the Commissioner. All administrative remedies have been exhausted.

### Procedural Background

The plaintiff, B. B., a minor, brings this action by and through his mother and next friend, Randi Hodges, seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for supplemental security income. Plaintiff's mother protectively filed for Child's Supplemental Security Income benefits on October 29, 2008, alleging disability onset beginning August 1, 2008 (R. 129, 166) due to problems related to

1

Attention Deficit Hyperactivity Disorder (R. 170). The administrative law judge ("ALJ") denied plaintiff's application on January 28, 2011 (R. 37–49). The Appeals Council denied plaintiff's request for review on September 20, 2011 (R. 16–18). The Appeals Council set that decision aside to consider additional information, but again denied plaintiff's request for review on December 13, 2011 (R. 1–3). The ALJ's decision thus became the final order of the Commissioner. *See* 42 U.S.C. § 405(g). This action for judicial review of the agency action followed (doc. 1). The court has considered the entire record and whether the decision of the ALJ is supported by substantial evidence. For the reasons set forth below, the decision of the Commissioner is due to be **AFFIRMED**.

## Factual Background

The plaintiff is a minor child, aged nine years at the time of the ALJ's decision, who was represented at the hearing before the ALJ by his mother (R. 56). Plaintiff has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and and a mood disorder, and also has a history of anxiety related disorder (R. 62).

Plaintiff's mother testified that the most problematic of these ailments is the ADHD; she said that plaintiff has a "hard time" focusing in school, "listening," and remembering to perform basic tasks like washing his hair when bathing (R. 63). Plaintiff's grades also dropped precipitously (from an A/B student to "Ds and Fs")

(R. 63). Plaintiff's medication was altered and he "had begun to have some aggression on the new medication," along with "involuntary jerking," and plaintiff's mother had him admitted to the hospital to "make sure that he was not going to harm anybody or himself" (R. 63–64). Plaintiff does not have "special needs" from a cognitive or intellectual functioning standpoint, and does not have a low I.Q. or mental retardation, but he does receive accommodation in the form of "special resources and some attention" from his school for his ADHD,[1] and his mother helps him with his homework "every night" (R. 65, 68). She testified that plaintiff "has to be walked through" his math homework and "can't focus long enough to work all the way through one problem" (R. 69).

With respect to plaintiff's mood disorder, his mother testified that plaintiff is "very tenderhearted" and that he "would just start crying and say that he felt all alone," would cry for "no reason," and would withdraw from group activities at school and had "a real hard time making friends" (R. 69–70). Plaintiff was subsequently placed on Zoloft, an anti-depressant, and as of the hearing had been on it "approximately a year and a half to two years" (R. 70). Plaintiff was previously on Prozac, which his mother described as "horrible" (R. 70). Plaintiff has experienced benefits from being on Zoloft, but "still has a lot of anxiety in large group settings

---

[1] *See* R. at 148–49 for a list of plaintiff's accommodations.

such as family events" and "still doesn't have a lot of friends" (R. 70). Plaintiff gets along well with his sister, his mother, and his stepfather (R. 73).

With respect to his general physical condition, plaintiff has a history of seizures; his mother testified she "witnessed one full-blown epileptic seizure and witnesses at school witnessed another one" (R. 71). His mother testified that both his father and paternal grandmother have epilepsy (R. 71–72). Plaintiff was hospitalized on one occasion for a seizure (R. 72). Otherwise, plaintiff's mother testified that plaintiff has no physical or musculoskeletal problems, and replied affirmatively when asked if plaintiff could "do the kind of things that typically nine-year-olds would do" (R. 73). She also testified that plaintiff could clean and dress himself without difficulty "once you've told him multiple times" (R. 74). She noted that she had planned to take him to a urologist because plaintiff was still wetting the bed at night "about five days a week" and was also "having daytime wetting," which she testified doctors had failed to attribute to a specific cause (R. 74).

The record provides significant evidence from plaintiff's teachers that he requires ADHD medication and that such medication improves his performance. The records indicate that plaintiff is eligible for Section 504 Services "due to impact of ADHD on ability to perform in the school setting" (R. 205).[2] Plaintiff "seems shy and

---

[2] A list of the accommodations needed is provided at R. 207–08.

unsure when answering multi-step questions. It's almost as if he knows the answer but has difficulty getting it out" (R. 179). Plaintiff's work "takes him [a long] time to complete" (R. 180). One teacher observed that after plaintiff takes medication, he "is better behaved and more able to focus and function in the classroom," but that "[t]here is a significant difference when [plaintiff] doesn't have his medication" and that the questionnaire she filled out "would be completely different if I filled it out using days when he isn't medicated" (R. 184); *see also* R. at 283.[3]

The record also shows that plaintiff has been diagnosed with mood disorder with anxiety (R. 257–59, 263–65, 275, 347). Plaintiff was initially prescribed four medications, on December 28, 2008, and January 4, 2009, to manage his ADHD and mood disorder: Desmopressin, 0.2 mg/daily;[4] Remeron, 22.5 mg/twice daily;[5] Metadate, 20 mg/daily; and Ritalin, 10 mg/daily[6] (R. 172, 212, 251, 254). Plaintiff underwent a psychiatric evaluation on September 30, 2008, and his Global

---

[3] As the ALJ observes (*see* R. at 42), the reports by plaintiff's teachers are from plaintiff's second grade teachers; plaintiff had progressed to the fourth grade by the time of his hearing.

[4] Desmopressin is a drug used to control bed-wetting. *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a608010.html (last visited September 6, 2012).

[5] Remeron is a brand name of Mirtazapine, a generic drug used to treat depression and major depressive disorder. *See* PHYSICIANS' DESK REFERENCE 124 (PDR Network, LLC, 2012).

[6] Metadate and Ritalin are both forms of Methylphenidate, a generic drug used to treat ADHD. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000606/ (last visited September 6, 2012).

Assessment of Functioning ("GAF") was reported to be 55 (R. 275, 347); according to the *Diagnostic and Statistical Manual of Mental Disorders, 4th Edition*, a GAF between 50 and 60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning.

On October 29, 2008, Dr. Robert Estock reviewed plaintiff's medical records when completing a Childhood Disability Evaluation Form for the state agency (R. 278–83) and found that plaintiff only had "Less Than Marked" limitations in one area: Attending and Completing Tasks, and no limitations in other areas (R. 280). His ultimate determination was that plaintiff exhibited an impairment or combination of impairments that is "severe, but does not meet, medically equal, or functionally equal the listings" (R.278).

On September 3, 2009, plaintiff underwent an EEG which "suggest[ed] the diagnosis of focal epilepsy arising from left parietotemporal regions" (R. 341). On September 18, 2009, plaintiff visited the emergency room complaining of a seizure (R. 336–37). The attending nurse noted that plaintiff "does not appear acutely ill," and that plaintiff "[l]eft without treatment" and "[l]eft without being seen by Physician . . . because [plaintiff and his family] felt it was taking too long" (R. 337). Plaintiff again returned to the emergency room twice in one day on October 4, 2009, complaining of seizures (R. 324–33). Plaintiff's mother noted that plaintiff has been

having an average of "one episode of seizure-like activity per week but had three episodes" that day (R. 331). During the first visit, plaintiff was prescribed a small course of Klonopin,[7] discharged, and advised to follow up with a neurologist (R. 332–33). Plaintiff was subsequently re-admitted after exhibiting further symptoms, including a staring spell and loss of bladder control (R. 326). Plaintiff underwent further testing, was prescribed "'High Alert' Ativan"[8] in addition to the Klonopin, and was again discharged (R. 326–28).

On October 5, 2009, plaintiff visited Dr. Jan Mathisen, a pediatric neurologist (R. 321–23). He underwent an EEG and was diagnosed with seizure disorder (R. 321–22). He was prescribed Keppra,[9] at varying dosages over the subsequent weeks, and discharged (R. 322). Plaintiff followed up with Dr. Mathisen on October 20, 2009, whose notes indicate that plaintiff "[l]eft without being seen due to long delay" (R. 311–12). Dr. Mathisen noted she recommended plaintiff continue taking the Keppra at varying dosages (R. 312).

On April 14, 2010, plaintiff visited the emergency room complaining of

---

[7] Klonopin is a brand name of Clonazepam, a generic drug used to treat seizures. *See* PHYSICIANS' DESK REFERENCE 119 (PDR Network, LLC, 2012).

[8] Ativan is a brand name of Lorazepam, a generic drug used to treat anxiety disorder and seizures. *See* PHYSICIANS' DESK REFERENCE 123 (PDR Network, LLC, 2012).

[9] Keppra is a brand name of Levetiracetam, a generic drug used to treat seizures. *See* PHYSICIANS' DESK REFERENCE 123 (PDR Network, LLC, 2012).

"[p]ossible focal seizure activity" (R. 302). Plaintiff's mother said that plaintiff "has been saying that he doesn't feel right for the past 3 weeks" and reported plaintiff had "several episodes of bladder incontinence, more frequent than normal and occuring both day and night"; teacher reports also indicated that plaintiff "had been staring off multiple times a day" (R. 303–04). The attending physician, Dr. Melissa Mannion, observed that "[d]escriptions of staring off in to space and incontinence are consistent with seizure[-]like activity" (R. 304). Plaintiff's Keppra dosage was increased to 750 mg in the morning and 500 mg at night, and it was recommended that plaintiff follow up with a neurologist in one week if symptoms persisted (R. 304–05).

During a reassessment of plaintiff by Dr. Jayne Ness on July 21, 2010, plaintiff's mother indicated that plaintiff's seizures were "still present" (R. 296). Plaintiff was still taking Keppra, 500 mg/twice daily, and no other substantive changes were noted in his condition or treatment plan (R. 296–300).

On August 19, 2010, plaintiff visited the emergency room complaining of a seizure (R. 395–99). Plaintiff's mother stated that plaintiff "went for dental work today and was giv[en] laughing gas and after they discharged him he had [a] seizure while sitting in the waiting room" that lasted about 45 seconds (R. 396). Plaintiff's exam revealed no abnormalities or injury, and he was discharged with no changes in medication or treatment recommendation (R. 397–99). Plaintiff underwent a 72 hour,

22 minute EEG in the awake, drowsy, and sleeping states between August 23 and 26, 2010 (R. 384–94). The EEG was "entirely normal" (R. 386). No additional diagnoses were provided (R. 390). Because plaintiff's seizure activity had continued, Dr. Ness switched plaintiff from the Keppra to Depakote, 750 mg/daily[10] (R. 386–87). Dr. Ness noted plaintiff "may also get some mood stabilization from Depakote, especially compared to Keppra which is quite notorious for worsening irritability in children with pre-existing behavioral problems" (R. 387). Plaintiff's next follow-up was scheduled for December 8, 2010 (R. 387).[11]

As of January 18, 2011, plaintiff was taking the following medications: Clonidine, 0.1 mg/daily;[12] Zoloft, 50 mg/daily;[13] Depakote, 750 mg/daily; and Adderal, 2.5 mg/twice daily[14] (R. 402–03). Records indicate that plaintiff had visited the Children's Behavioral Health Department of Children's Health Systems of

---

[10] Depakote is a brand name of Valproic Acid, a generic drug used to treat seizures and mood disorders. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000677/ (last visited September 6, 2012). Plaintiff's physician prescribed Depakote "[t]o control mood" (R. 402–03).

[11] No records pertaining to this follow-up visit were submitted either to the ALJ or to the court.

[12] Clonidine is a generic drug used to treat a variety of conditions. *See* PHYSICIANS' DESK REFERENCE 119 (PDR Network, LLC, 2012). Plaintiff's physician prescribed Clonidine "[t]o treat behavioral problems" (R. 402–03).

[13] Zoloft is a brand name of Sertraline, a generic drug used to treat a variety of mood disorders. *See* PHYSICIANS' DESK REFERENCE 126 (PDR Network, LLC, 2012).

[14] Adderal is a combination of dextroamphetamine and amphetamine, and is used to control symptoms of ADHD. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000166/ (last visited September 6, 2012).

Alabama from January 13 through 18, 2011 (R. 405).[15] At that time, plaintiff was discharged with instructions to return to school on January 19, 2011, with no restrictions, and plaintiff's parents were advised that plaintiff "would benefit from continued medication monitoring focusing on behavior and mood symptoms" (R. 405–06).

Plaintiff underwent a neuropsychological evaluation on January 20, 2011, by Daniel S. Marullo, Ph.D., a licensed pediatric psychologist  (R. 407–418). The clinical impression was that the results of the evaluation

> indicates [plaintiff's] core intellectual and cognitive skills to be intact and within the average range of functioning. [Plaintiff's] scores do not indicate a specific learning disorder at this time. His verbal learning and memory is intact; although he demonstrates a passive learning style and does not use efficient learning strategies. . . . At this time, [plaintiff] continues to meet criteria for *Attention-Deficit/Hyperactivity Disorder, Combined Type (314.01) and Cognitive Disorder NOS (294.9) characterized by executive deficits*.
> . . . In addition, [plaintiff's] psychiatric functioning can exacerbate his executive deficits and adversely affect his academic performance despite adequate cognitive skills.

(R. 411–12). Dr. Marullo made five specific recommendations for plaintiff and his teachers: plaintiff should continue with psychiatric follow-ups; plaintiff should work with a child psychologist to "develop adequate coping skills and social skills";

---

[15] Later records indicate he was hospitalized "to address aggressive behavior and poor concentration" (R. 408).

plaintiff would continue to benefit from 504 Modifications; plaintiff should receive "basic classroom accommodations"; and plaintiff "will benefit from learning more active strategies for learning, including how to manage a planner" (R. 412).[16]

## Standard of Review

In a Social Security case, the initial burden of establishing disability is on the claimant, who must prove that due to a mental or physical impairment he is unable to perform his previous work. *See Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). If the claimant is successful, the burden shifts to the Commissioner to prove that the claimant can perform some other type of work existing in the national economy. *See id.*

This court's review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983). *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is generally defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938));

---

[16] Some suggested accommodations and strategies pertaining to these final two recommendations were listed in a handout appended to Dr. Marullo's report; *see* R. at 413–18.

*see also Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Bloodsworth*, 703 F.2d at 1239.

This court also must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *See McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir. 1993). No presumption of correctness applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *See Brown v. Sullivan*, 92 F.2d 1233, 1235 (11th Cir. 1991); *Corneliuis v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Furthermore, the Commissioner's "failure to . . . provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius*, 936 F.2d at 1145–46. When making a disability determination, the Commissioner must, absent good cause to the contrary, accord substantial or considerable weight to the treating physician's opinion as against the opinions of other physicians. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988); *Walker*, 826 F.2d at 1000.

## Legal Analysis

The guidelines and requirements for the finding of a disability for minor children are more intricate that those applicable to adults. The ALJ's detailed and

thorough opinion clearly sets forth these guidelines (*see* R. at 37–40) and traces, in minute detail with numerous specific references to the record, the reasoning behind his opinion. Most significant, "[t]o functionally equal the listings" and qualify for benefits, "the [social security] claimant's impairment or combination of impairments must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain" (R. 38); *see also* 20 C.F.R. § 416.926a(d).

In this case, the ALJ found that plaintiff has the severe impairments of ADHD, mood disorder with mixed anxiety features, and non-focal epileptic type-seizure vs. syncope events (R. 40). He then denied plaintiff benefits, finding that "[n]o treating or examining physician has opined that the claimant has impairments, singly or combined, that medically equals a listed impairment" (R. 41). Scrutinizing plaintiff's medical history, the ALJ finds that plaintiff suffers "less than marked limitation" in acquiring and using information, interacting and relating with others, and in his health and physical well-being; "marked limitation" in attending and completing tasks; and "no limitation" in moving about and manipulating objects and caring for himself (R. 43–48).

The court finds the ALJ's opinion to be supported by substantial evidence, drawn from the record, which the ALJ cites and references repeatedly throughout his opinion. With respect to plaintiff's ability to acquire and use information, the ALJ

found that while plaintiff exhibited demonstrable difficulties in school because of his ailments, "the evidence indicates that the combined effects of [plaintiff's] accommodations and . . . treatment medications is successful" (R. 44). Though plaintiff does have a "less than marked limitation" interacting and relating with others, the ALJ noted that "[w]hile the evidence reveals that the claimant's mood disorder results in his desire to isolate himself from groups and difficulty making new friends, nevertheless, *he has the functional ability to interact with others*. . . . The record contains no disciplinary actions from the claimant's school due to behavior issues [and] his most recent mental health treatment noted no behavior problems." (R. 46). As for plaintiff's "less than marked limitation" in health and physical well-being, the ALJ observed that "the treatment records demonstrate that [plaintiff's] new medication has ostensibly begun to control this condition," and specifically noted that plaintiff's prolonged ambulatory EEG "was entirely normal" (R. 42; *see also* R. at 386). Finally, the ALJ observed that plaintiff's difficulties attending and completing tasks were ameliorated by assistance from his parents and teachers, "the need to prompt constantly [the plaintiff] to remain on task represents a significant limitation" supporting the finding of a "marked" limitation in this area (R. 44–45).

Before the court in this case are multiple medical opinions concerning the scope and severity of plaintiff's ailments. As the ALJ properly observes, the evidence

14

demonstrates that all of these ailments are ameliorated or mitigated through treatment to the point that they do not form an impairment or combination of impairments that result in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning, as required under the regulations. As noted above, the sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *See Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983). The court has carefully reviewed the entire record in this case and is of the opinion that the Commissioner's decision is supported by substantial evidence and that proper legal standards were applied in reaching that decision.

## Conclusion

Based on the foregoing, the court is of the opinion that the decision by the ALJ is well-supported by substantial evidence and that proper legal standards were applied in reaching that decision. Therefore, the decision of the Commissioner must be **AFFIRMED**. The court shall so rule by separate order.

**DONE** and **ORDERED** this the 21st day of September, 2012.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE